IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FROZEN WHEELS, LLC, <br><br> *Plaintiff/Counter-Defendant* <br><br> v. <br><br> POTOMAC VALLEY HOME MEDICAL, INC., *et al.* <br><br> *Defendant/Counter-Plaintiff* | Civil Action No. CCB-20-2479 |

## MEMORANDUM

Pending before the court is a motion for summary judgment filed by plaintiff/counter-defendant Frozen Wheels LLC ("Frozen Wheels"). (ECF 68.) Specifically, Frozen Wheels seeks summary judgment on its breach of contract claim against defendant/counter-plaintiff Potomac Valley Home Medical, Inc. ("Potomac"). The matter has been briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, Frozen Wheels's motion for summary judgment will be denied.

## BACKGROUND[1]

In the early stages of the COVID-19 pandemic, companies rushed to meet the increased demand for masks, gloves, and other personal protective equipment ("PPE"). Potomac Valley Home Medical, a Maryland-based medical supplies company, was part of this rapidly changing supply chain environment. On April 30, 2020, Potomac received a purchase order from the State

---

[1] The court describes the facts drawing reasonable inferences in favor of Potomac, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

of Maryland ("State") to provide the State with certain PPE, including 10,000,000 KN-95 masks. (ECF 77-4, State Purchase Order.) Potomac looked to other suppliers and distributors for assistance in filling the order. Frozen Wheels, a Florida-based distribution and warehousing company, appeared to fit the bill. On May 11, 2020, Potomac submitted a purchase order to Frozen Wheels for the delivery of 4,000,000 KN-95 masks by May 19, 2020. (ECF 77-5, May 11 Purchase Order.)[2]

By May 20, 2020, however, Frozen Wheels had delivered only 3,506,960 KN-95 masks. (ECF 77-6, May 20 Invoice.) On May 26, 2020, Potomac had approximately 9 of the 10 million KN-95 masks it needed for the State's order, including the 3.5 million it had already procured from Frozen Wheels. (ECF 77-2, Abdus-Salaam Decl. ¶¶ 15–16.) That day, Potomac's Chief Executive Officer, Kareem Abdus-Salaam, spoke with the owner of Frozen Wheels, Isaac Halwani, about delivering 1.5 million KN-95 masks to finish the State's order. (*Id.*) Although Potomac was only short by one million KN-95 masks, Abdus-Salaam promised to invoice the State and pay Frozen Wheels for the entire lot if the State accepted the additional 500,000 KN-95 masks. (*Id.* ¶ 16.) On May 27, 2020, Abdus-Salaam issued a purchase order to Frozen Wheels for the delivery of 1.5 million KN-95 masks by May 30, 2020. (*Id.* ¶¶ 15–18; *see also* ECF 68-2, May 27 Purchase Order.)

Potomac alleges Frozen Wheels failed to deliver the 1.5 million KN-95 masks on May 30, 2020. (ECF 77-1, Def. Mem., at 2; ECF 77-2, Abdus-Salaam Decl. ¶ 19.) Frozen Wheels disputes this, contending it delivered the masks on May 30. (ECF 68-4, Halwani Decl. ¶ 4.) In any event,

---

[2] This case involves other contracts between Potomac and Frozen Wheels. For example, Potomac's counterclaim alleges that Frozen Wheels breached an agreement to deliver 1,500,000 isolation gowns by May 30, 2020. (ECF 14.) The court summarized these facts in greater detail in its prior memorandum. (ECF 46.)

2

the State refused to pay for any KN-95 masks other than the requested 10 million and told Potomac to pick up the extra 506,960 masks. (ECF 77-13, State Rejection Email, at 1.)

On June 1, 2020, Potomac's CEO informed Frozen Wheels of the State's rejection and told Frozen Wheels to retrieve the 506,960 masks from the State facility. (ECF 77-2, Abdus-Salaam Decl. ¶ 23.) Frozen Wheels never retrieved the extra masks from the State. (*Id.* ¶ 27.) According to Potomac, Frozen Wheels initially agreed to work with Potomac to sell the extra 506,960 masks (*id.* ¶ 26) but then failed to do so (*id.* ¶ 29). In the meantime, Potomac has evidently "stored the surplus 506,690 KN-95 masks for Frozen Wheels." (*Id.* ¶¶ 27–29.) Frozen Wheels, however, alleges that Potomac persuaded the State to keep—and pay for—*all* the masks. (ECF 68-4, Halwani Decl ¶¶ 7, 9–10.)[3] Frozen Wheels filed the present action[4] to recover $1,050,000 for the delivery of 506,690 KN-95 masks.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court

---

[3] Potomac paid Frozen Wheels $2,100,000 for 1,000,000 masks on June 5, 2020. (ECF 40, Second Am. Compl. ¶ 21.)

[4] Specifically, Frozen Wheels's Second Amended Complaint includes breach of contract, promissory estoppel, and unjust enrichment claims. (*See generally* ECF 40.)

must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

To establish a breach of contract claim under Maryland law,[5] a plaintiff must prove (1) the existence of a legally enforceable contractual obligation owed by the defendant to the plaintiff, and (2) a breach of that obligation by the defendant. *See RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010). The primary question here is whether Potomac, by declining to pay for 506,690 KN-95 masks, breached an obligation to Frozen Wheels. Because disputes of material fact prevent the court from answering that question via summary judgment, the court will deny Frozen Wheels's motion.

The relevant purchase order required Frozen Wheels to deliver all goods by May 30, 2020. (ECF 68-2, May 27 Purchase Order.) Whether Frozen Wheels met this deadline is in genuine dispute. On the one hand, Frozen Wheels submits a declaration attesting to the fact that 1.5 million KN-95 masks were delivered on May 30. (ECF 68-4, Halwani Decl. ¶ 4.) Additionally, Frozen

---

[5] Both parties appear to agree that Maryland law applies to the present dispute. (ECF 68-1, Pl.'s Mem., at 4 n.2; ECF 77-1, Def. Mem., at 5–7.) The court does not disagree. Maryland's conflict of law rules apply to this case, where the court's subject matter jurisdiction is premised upon diversity of citizenship. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941). Although the purchase orders do not include a choice of law provision, the Maryland Uniform Commercial Code applies to transactions "bearing an appropriate relation" to the State. *See* Md. Code Ann., Com. Law § 1-301(b). Here, the delivery at issue occurred in Maryland, a relevant entity is the State of Maryland, and Potomac is a Maryland-based company. Accordingly, the court will apply Maryland law.

Wheels points to signatures on the bills of lading[6] dated May 30, 2020. (ECF 68-3, Bills of Lading, at 2–3.) On the other hand, text messages from the owner of Frozen Wheels suggest the company was delivering goods up until the late afternoon of May 31, 2020. (ECF 77-10.) And Potomac provides its own declaration stating that Frozen Wheels did not deliver the 1.5 million KN-95 masks by May 30. (ECF 77-2, Abdus-Salaam Decl. ¶¶ 19, 21.)

At this stage, Frozen Wheels has not provided enough evidence to establish that it timely delivered the masks. The bills of lading were signed and dated in the margins with no indications the signatures were provided upon receipt of the goods. And Frozen Wheels's declaration swearing that the masks were delivered by May 30 is squarely rebutted by a declaration from Potomac to the contrary. Distilling the truth from these competing declarations would require the court to make credibility determinations that are inappropriate when evaluating a motion for summary judgment. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). To be sure, the text messages submitted by Potomac (ECF 77-10) could refer to the delivery of *other* goods[7] under a *different* contract between Frozen Wheels and Potomac. But the court must draw all reasonable inferences in Potomac's favor at this stage. *See Jacobs*, 780 F.3d at 568–69. Accordingly, the text messages suggesting that Frozen Wheels delivered goods up until May 31, 2020, combined with a declaration from Potomac attesting to the untimely delivery of the KN-95 masks, provide enough evidence to put the time of delivery in dispute.

Whether Frozen Wheels delivered the masks by the deadline raises a question of material fact. When a seller fails to tender goods according to contractual requirements, the Maryland

---

[6] A bill of lading is a document that records a carrier's receipt of goods from a shipping party, "states the terms of carriage, and serves as evidence of the contract for carriage." *ABB Inc. v. CSX Transp., Inc.*, 721 F.3d 135, 138 (4th Cir. 2013 (quoting *Norfolk S. Ry. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 18–19 (2004)).

[7] For example, Potomac submitted an email from the owner of Frozen Wheels which seems to describe the scramble to deliver goods into the late hours of May 31, 2020. (ECF 77-11.) The subject-line of that email mentions medical gowns—not KN-95 masks. (*Id.*)

5

Uniform Commercial Code ("UCC") provides buyers the right to reject goods. Md. Code Ann., Com. Law § 2-601.[8] This provision, known as the "perfect tender rule," permits the rejection of goods "for any trivial defect, whether relating to the quality of the goods, the time of performance, or the manner of delivery. When the seller makes a late delivery of the goods, he violates the perfect tender rule and the buyer is released from the duty to accept the goods." *See* 4 Anderson, *Uniform Commercial Code* § 2-601:9 (3d. ed. 2021).[9]

Under the UCC, a buyer must reject the goods within a reasonable time after their delivery or tender, and seasonably notify the seller of the rejection. Md. Code Ann., Com. Law § 2-602. Potomac appears to have complied with the rejection and notification requirements. The day after Potomac's CEO learned of the allegedly late delivery, he informed Frozen Wheels that the State rejected 506,960 masks and that Frozen Wheels needed to retrieve them from the State's facility. *See* ECF 77-2, Abdus-Salaam Decl. ¶ 23; *Smith v. Butler*, 311 A.2d 813, 816 (Md. Ct. Spec. App. 1973) ("[T]here is no requirement as to the content of the notice. It is sufficient if the buyer apprises the seller that the goods are defective[.]").[10] According to Potomac, Frozen Wheels did not retrieve the masks and Potomac has safely stored the surplus masks for Frozen Wheels. (ECF 77-2, Abdus-Salaam Decl. ¶¶ 27–29.) Potomac's possession of the masks in this manner did not constitute acceptance of the goods under the UCC. *See* Md. Code Ann., Com. Law § 2-604 (permitting a

---

[8] Whether Potomac paid for some, but not all, of the masks is immaterial. Assuming Frozen Wheels failed to meet the deadline, the UCC confers Potomac the right to accept any number of the masks and reject the rest. *See* Md. Code Ann., Com. Law § 2-601(c).

[9] According to Frozen Wheels, the State rejected the masks because Potomac intentionally over-ordered from multiple suppliers to ensure it could satisfy the State's order. But the reason *why* the extra masks were not accepted is immaterial if Frozen Wheels, in fact, failed to deliver the masks on time.

[10] Frozen Wheels's reliance on *Lynx, Inc. v. Ordnance Prod., Inc.*, 327 A.2d 502, 507 (Md. 1974), is unfounded. *Lynx* involved a buyer that attempted to reject fuses after they allegedly failed to pass a field test. *Id.* at 507–08. However, "the first time" the buyer claimed these goods were rejected was in response to motions for summary judgment. *Id.* at 514–15. Further, the fuses at issue had already been accepted by the government after an initial inspection. *Id.* at 515. This is quite distinct from the present case, where Potomac allegedly provided notice of the rejected goods within a day of the late delivery.

6

buyer to store rejected goods for a seller in the absence of instructions after notification of rejection); *see also Clark v. Zaid, Inc.*, 282 A.2d 483, 486 (Md. 1971) (describing circumstances where buyer may retain possession of goods). Accordingly Frozen Wheels's motion for summary judgment will be denied.[11]

## CONCLUSION

For the foregoing reasons, Frozen Wheels's motion for summary judgment will be denied. A separate order follows.

8/16/22
Date

CCB
Catherine C. Blake
United States District Judge

---

[11] Potomac makes several other arguments, such as Frozen Wheels's failure to mitigate damages, in opposing Frozen Wheels's motion for summary judgment. The court need not reach these issues at this time.